Mr. Parker? Yes, Your Honor. Good morning. Thank you, Your Honors, and may it please the Court, my name is Thomas Parker, and I am counsel for appellant Mylan Pharmaceuticals. Your Honors, at the heart of this case lie fundamental principles of inventorship, which the District Court misapplied in finding that Dr. Lofando was not a co-inventor of compounds 4E, 4F, 6E, 6D, and ezetimibe. This fundamental error also infected the Court's subsequent analysis, leading to the erroneous conclusion that the 461 patent is valid and enforceable. I'd like to first address the Court's error regarding inventorship, and if I may, Your Honors, begin with compounds 4E and 4F. So I've been held that conception is the cornerstone of inventorship. Let me tell you what the problem I see is that even if Lofando contributed to the invention of 4F, let's say hypothetically that he had a unique method of making 4F and therefore was an inventor of 4F, it strikes me that what the District Court has said here is that 4F didn't contribute to the invention of Vitorian or whatever the final product was. With respect to ezetimibe, and Your Honor, that's correct. What we're saying is we break out the compounds very specifically because with respect to the 115 patent, that's the original underlying patent, that covered compounds 4E, 4F, 6C, 6D, and ezetimibe standing alone. And just with respect to the compounds 4E and 4F, for example, that Dr. Lofando is in fact a co-inventor of compounds 4E and 4F. Let's assume for purposes of this discussion for the moment that the reissued patent was proper in stripping out the 6C and E compounds and the 4E and 4F compounds and we're just left with the zettia compound, whatever it is. So how is it that Mr. Alfonso's role in inventing 4F makes him an inventor of the final compound? That's the problem I'm having. The District Court concluded that the invention of the final compound didn't depend upon 4F. But what we're saying is with respect to the 115 patent, to the extent that that issued and Dr. Alfonso should have been named on that patent, what we're saying is that he's an omitted inventor. Why is he an omitted inventor? Because he intentionally had his name removed. I'm asking you for the moment to leave that aside. I understand that argument. Let's assume that the reissued patent was proper and can't be challenged. Just hypothetically. Why does the fact under those circumstances that he's an inventor of 4F carry over and make him an inventor of zettia? Then we're just talking simply about the inventorship with respect to zettia, irrespective of whether or not there was deception. So basically with respect to zettia, Dr. Alfonso contributed to the discovery of that particular compound. So just on his contribution alone and what he had done in collaboration with Dr. Rosenblum would render him a co-inventor of ezetimibe, as that is now being claimed. What has the District Court found against you? The District Court found essentially that Dr. Rosenblum independently discovered or conceived of the structure of ezetimibe. But also at the same time, the District Court attributed certain aspects of Alfonso's work to the discovery of ezetimibe. And that's in pages 10 and 25 of the District Court opinion. I think the District Court found that Dr. Alfonso first reached the structure, the 4F structure, but that the 4F structure did not contribute to the invention of the ezetimibe. That was the Court's finding, but that finding in itself, I mean we have Dr. Rosenblum's own memos and reports which basically lay out the conception of ezetimibe and showing the thought process leading to ezetimibe. So you think your finding is clearly erroneous? Yes, yes we are. So tell us why it's clearly erroneous. Well with respect to, if we look at exactly, again going back to for example the evidence, with Dr. Rosenblum's memos and documents which actually lay out the thought process of the conception of ezetimibe which actually included 4F. And for all intents, 4F is essentially ezetimibe. They all have the same functional groups as noted by the District Court. They only differ with respect to the fluorine atoms that are added to block non-metabolic sites. But the addition of the fluorine atoms, that's what created ezetimibe. I mean that's the invention. The invention is essentially, well it's a modification of ezetimibe. And in fact it wasn't until, very importantly, it wasn't until after Dr. Alfonso synthesized 4F, it wasn't until after it was tested, that at any point in time did anyone attempt to synthesize ezetimibe. In fact, the complete depiction of ezetimibe doesn't even come up until March of 94. Now critical to the Court's analysis was starting material, for example, that Dr. Rosenblum had his assistants prepare. But that was perhaps, I think that was done in November of 93, December 93, but that starting material was not uniquely associated with synthesizing ezetimibe. In fact, he went on to synthesize other fluorinated compounds that were not ezetimibe. So the starting material doesn't really, doesn't corroborate any independent conception on the part of Dr. Rosenblum. And what Dr. Rosenblum put... What was the evidence though that Dr. Rosenblum was relying on the invention of 4F in reaching the final compound? The evidence would be his, Dr. Rosenblum's own internal reports, which there are about a half dozen of them. Which actually, we illustrate these in our brief, which actually talk about strategic modifications. It talks about how exactly they got to ezetimibe. And the critical component of that compound is 4F. 4F was the most active compound, targeted compound, that were actually synthesized. And Dr. Rosenblum was even unable to synthesize 4F. It wasn't until Dr. Afonso came in with his process, made 4F, only then, only then did the discovery of ezetimibe fall thereafter. I mean, this is a question of joint inventorship. They were working together, collaborating. This was an aggregate effort of two scientists that were working every single day together. And so they were working towards the same goal, and that is trying to develop, synthesize, isolate potent compounds. And so as they were working together, certainly the molecular scaffolding of 4F, which as a co-invented Dr. Afonso would be, contributed that aspect as well. So it's not like, it's almost like the district court is saying that you can only have one inventor for one compound. When in fact, you can have multiple inventors on a single compound, contributing to various substituents and various aspects of the molecule. And here, given the collaboration, Dr. Afonso, as a co-inventor of 4F, certainly contributed the molecular scaffolding, which is critical to ezetimibe in terms of its activity, in terms of the various active sites. Those are basically the same. It sounds to me that what you're saying is that Dr. Afonso's discovery of 4H was reduced in practice. That doesn't make him the co-inventor of ezetimibe, does it? Afonso's contribution, in terms of contributing the actual molecule itself. In other words, nothing really took place until after this compound became available. And again, it's more a question of joint inventorship. So we're not arguing that reduction of practice. What we're arguing is that certainly contributing the compound through his synthesis and through his co-inventorship status of that compound, in collaboration with Dr. Rosenblum. So I followed the pieces of evidence you're talking about, the chronology and the charts and the notes and things that were written, and I'm left with the impression that what happened is that Dr. Rosenblum reduced to practice the 4F structure, but then he went on and, on a separate basis, discovered the ezetimibe, or reached the ezetimibe. Well, I don't know if that was necessarily a separate basis, because the court noted in his opinion that after the synthesis of 4F, did Dr. Rosenblum then consider modifying 4F to get to ezetimibe. So it wasn't like it was independent, it was all part of their collaboration, they were working together. Dr. Afonso was the supervisor of Dr. Rosenblum at the time, and so they were working together continuously. But working together doesn't make him a co-inventor unless he made a contribution to the final invention, and if we assume that the patent is limited to ezetimibe, or whatever you want to call it, the problem is the district court has said there was no link between the invention of 4F and the final compound. Right. And, you know, what it seems to me you're asking us to do is to look at some of these documents, and, you know, I mean, you've got a point about them. If I were sitting as a district judge, I might agree with you. But the problem is, you know, if I understand it, didn't Rosenblum get on the stand and say there was no connection between 4F and ezetimibe? Dr. Rosenblum testified to that effect, that he did not rely on Dr. Rosenblum's efforts. I'm sorry, Dr. Afonso's efforts, but that was totally inconsistent with what the documents set out, even Dr. Rosenblum's own documents, with respect to the discovery of 4F. And that's what we put forth in front of the court. And again, in the court's opinion, he does attribute at least the fact that Dr. Afonso contributed, or at least the language that he used was, let me just see for a second. No, it's not it. No, it's basically that the district court found on page 25 of the opinion that Dr. Afonso,  made a contribution that either inspired or informed the ultimate invention of ezetimibe, which the court later said was not sufficient to render him an inventor of the compound. But certainly though, it does suggest the court recognized that there was some effort on the part of Afonso's part that was connected to the discovery of ezetimibe. And yes, we're saying that that was an erroneous finding on the district court's part, that Afonso did contribute, call it the molecular scaffolding, but for all intents and purposes, the compounds, as we illustrated, are virtually identical. And it was only then did they actually decide to, and Rosenblum testified that using the fluorine atoms was something that was known in the art, that was something that when he did it, he was based upon information and literature that he had known in the prior art. Looking at the court's opinion on the page you cited, it says that ezetimibe may never have been invented without Dr. Afonso's first successful synthesis of the compounds 4A and 4F is speculative. Yes, I see that, Your Honor, yes. And so that's what the court found, but that's where we're challenging that particular finding. It was not at all speculative. They were working together. In fact, 4F, as Your Honor noted, that there are memos and documents which indicate certainly that 4F played a role with respect to the conception and discovery of ezetimibe. So that's what we're challenging, basically, is that court's finding in light of the weight of the evidence that was presented or that was induced during trial. Okay, do you want to save your rebuttal time? Yes, Your Honor. Okay, thank you. Mr. Critican. May it please the court. The district court concluded that Milan had failed to prove the essential factual predicates underlying its case, that Afonso was an inventor and that there was some deceptive intent, some intent to deceive the patent office. These are quintessential factual questions. If you look at the brief that was filed by Milan... Is the intent question with respect to the reissue statute as it used to exist the same intent question as for inequitable conduct? It's an interesting question you raise in that respect, Your Honor. I believe it is the same... We never held that. ...with respect to that. On the reissue question, I don't believe there is a square quoting on that, although in the fairly recent Resuvistatin case, the Crestor case, I think the court there equated the intent standard with respect to reissue with the intent standard under Theracense. I believe that is correct, Your Honor. What they've raised are factual questions here. We had an 11-day trial. There were numerous witnesses. The court assessed the credibility, heard from Afonso, heard from Dr. Rosenblum, heard from Dr. Burnett, one of the other key inventors on the case, assessed the credibility of these witnesses and made detailed factual findings. It's an unusual case in the sense that Milan had conceded that Schering was entitled to a patent. Milan had conceded that they infringed the patent. They conceded that the patent was not anticipated or that it was obvious. They conceded that it met the 112 requirements. They had a strong motivation to challenge it because it is a multi-billion dollar drug, a very successful drug, and they came up with the inventorship theory that was urged below. On appeal, what they have done, and again, just in the last 15 minutes, is to try to cherry-pick the evidence, present bits and pieces of it, the kinds of arguments they made to the district court, and the district court properly rejected. Because Milan spent a considerable amount of time dealing with the ezetimibe issue that Judge Dike, that you had posed, let me deal with that first. The court is correct that ezetimibe is the only compound that is claimed in the 461 reissue patent. The district court found that Rosenblum was the inventor of ezetimibe. Afonso himself had conceded that the structure of ezetimibe was something that Rosenblum had come up with. And there was no question that Rosenblum had, on his own, an operative way to make ezetimibe. In fact, the way that he made it and the way that is disclosed in the patent to make it is not this process that Afonso called his biphasic salvolysis process that he had used to make 4F, it's a different process, and much closer, according to Professor Rausch, to the method that had been used by Rosenblum when he attempted to make 4E and 4F. Milan's theory was indirect, that somehow 4F had contributed or had inspired ezetimibe, and again the district court rejected this as a factual matter, and it really fell apart because the sequence of events just didn't hang together. The court went through this in considerable detail at pages A25 to 27, that portion of the opinion, and the basic problem with it is, the theory, and this was presented in detail at trial, is that Rosenblum had come up with the structure of ezetimibe by November 9th of 1993, and this was corroborated both in his report and where he had shown the structure of the prodrug of ezetimibe, and that's at A14, and the court specifically cited DTX-265, which is the report itself that contains the depiction of the structure. This is prior to when Afonso made compound 4F. He made it in December of 1993, so we've antedated by a full month the conception of ezetimibe. Rosenblum set about to do the synthesis, directing his assistant to begin in December, and it carried over a long period of time because he was out of the lab, and the final synthesis was in March of 1994. The problem that Milan had was, they argued that 4F, that the structure of it, that it was an effective compound, and that's what had inspired ezetimibe, but the problem with that was that the animal test results for 4F came too late. They came too late to have inspired the structure. They were not available until sometime in, I believe, late February of 1994, and so the whole thing doesn't fit together. It couldn't have been the efficacy of 4F that inspired ezetimibe because they didn't know about that until late February of 1994, but Rosenblum had conceived ezetimibe back in November and had directed his assistant to begin the synthesis of it, and during the trial, Rosenblum went through the lab notebooks page by page, carrying it over, showing how the synthesis had begun with the starting materials in November and then carried right on through to the final synthesis in March of 1994, so the theory fell apart as a factual matter. To say that this is error, to say that this is clearly erroneous, Mylan just can't get there on the record with respect to ezetimibe. Now, beyond that, in order to overturn what the district court did, there are multiple and independent factual determinations that the district court made that would have to be overturned in order to rule in their favor. I'm going to leave intent to one side for the moment because the district court had clear findings on intent as well, that there was no intent on the part of anyone to deceive the Patent and Trademark Office. Let me speak for just a moment about the other compounds that are at issue here. So compounds 4E and 4F, as the court noted, those are not claimed in the 461 patent. Their theory was because those had been claimed in an earlier patent that perhaps there's some infectious unenforceability, even more attenuated. But again, the court concluded that Afonso simply was not an inventor of compounds 4E and 4F. They try to present this now as a joint inventorship case, but joint inventorship, as your Honor pointed out, Judge Dyke, is there has to be something that you contribute, and it has to be something that is beyond what is known to people who are already working in the field. With respect to compounds 4E and 4F, they fail on multiple levels to get to where they need to be. Yeah, but my reaction was that the district court's findings with respect to the lack of inventorship of 4F is much more tenuous than some of the other findings that he made, and particularly with respect to the method of making 4F. There seemed to be a significant amount of evidence that Afonso did contribute a method of making this, which led to the ultimate ability to do so. Yeah, let me address that directly, your Honor. In fact, wasn't the 4F compound discovered to have the greatest value of absorption of cholesterol? Yes, but that came too late, your Honor, to have led to. That was in late February. Those were the test results that came too late, but the process itself that led to that. They worked on that together at that time. No, the process was a process for making it. In terms of the efficacy of 4F, its potency, the argument they're making is that because you know the molecular structure of that, that somehow that would inspire you to make acetamide. But they didn't know that 4F was a potent compound until late February after Rosenblum, long after he had already conceived acetamide. That's where that falls apart. But let me address the question on the process. There's no question that Afonso had a method for making it, but that doesn't make someone a co-inventor. The question, the relevant question is, were the named inventors in possession of methods of making the compound? Yeah, that's where I'm not so sure. Yeah, let me address that directly, your Honor, because I think some of the context is important there. The 440 application was the first patent application filed in this series. It was filed in September of 1993. And what it claimed, if one can visualize this molecule, is putting an OH on that side chain that goes out. I mean, that was kind of the thing that gave these compounds much greater efficacy. It claimed a broad genus. It had some examples there. And in that patent application, the inventors and Rosenblum, Burnett, Claytor, key people here were all named inventors on that, disclosed six or seven different methods for making this series of compounds. And they disclosed them in the kind of detail you would expect to find in a patent, something that would enable people with skill in the art to use it. And that's the reason why the disclosure is there and the detailed disclosures are there for each of these methods. The testimony at trial from Professor Rausch and also from Rosenblum was that those methods could be used to make compound 4E and 4F. And there was no testimony on the other side that there was some reason why these methods wouldn't work. Rausch went through them in some detail on the record and explained how they would be used. And these are the kinds of disclosures that one makes. They're enabling disclosures in order to be able to make those compounds. Were these methods the ones that Rosenblum was using when he failed to make 4F? Rosenblum... What's the answer to the question? One of them is. One of the methods was the one that Rosenblum used. We know that it's an operative method to make these compounds because Rosenblum had used it to make compounds 4A and 4B earlier. 4A and 4B are almost indistinguishable from 4E and 4F. The only difference in the structure is on the C4 phenol. Whether you have a methoxy there or an OH. The only difference. That molecule is the same in every other respect. There was no question that Rosenblum had used it successfully on multiple occasions to make compounds 4A and 4B in large quantities for animal testing. The testimony of trial was that that demonstrates that the method could be used to make compounds 4E and 4F. There was no testimony from the chemistry expert of my land as to why that wouldn't work to make 4E and 4F. Why do you think Dr. Rosenblum would pay so much attention to the development of 4A all the way through to 4F? It's a fair question. What happened was that the first breakthrough they had when they were discovering this series of compounds was that the hydroxy group on that side chain was a very beneficial thing to do. That was 4A and 4B. That was the big breakthrough. When they discovered those, they tested them. That gave him the stereochemistry. But the absorption level of those structures wasn't sufficient. Well, 4A and 4B were, at that time, the best compounds that they had made. That was in the summer of 1993. This prior compound, Schering 48461, which had been their lead compound in 4A and 4B and 4E and 4F, it appeared that they may have been metabolites of that. That was still in clinical development. And the reason in the fall of 1993 that Rosenblum was trying to make 4A and 4F and that that was considered a high priority target at the time was not because they were interested in 4A and 4F at that time as a possible drug. The reason that they had to synthesize it was that 48461 was in clinical development. And when the drug is in clinical development, you need to have samples of the possible metabolites of it to support your studies for clinical development of a drug. The testimony from Rosenblum, from Burnett, and others was that was why they were making 4E and 4F in November of 1993. That's why they wanted Afonso to make it. He was a pair of hands. He liked to make compounds in the laboratory. It wasn't for purposes of drug discovery at that point. Rosenblum's testimony was that by November of 1993 he had already conceived the idea of putting the fluorines on the compound. It's in his reports from that time. That's what he was interested in. And so in November of 1993, he made a couple of attempts to make compounds 4E and 4F using the very same process he had used successfully to make 4A and 4B and other compounds. When he didn't get it, he didn't register it, and he moved on and began the synthesis of ezetimibe and the fluorinated compounds. What are we to make of that, of the reissue proceedings that seem to be directed at eliminating anything that Afonso may have touched? Yeah, well, that wasn't the purpose of the reissue proceeding, Judge Mayer. The purpose of the reissue proceeding was that there were compounds that were claimed in the patent before the reissue that were asserted to be metabolites of 4A461. We had litigated that for three years against Glenmark. That was their argument, front and center, that this patent is inequitable conduct, you name it. There were defenses based on that. When we got into this case, those issues were raised again by Milan. Once the Glenmark case had been settled, that was the reason for going in on the reissue. What was the reason? To remove the compounds that were alleged to be metabolites of 4A461. Because? Because there was an inherent anticipation defense that had been raised, and we didn't want to litigate again the question of whether or not Schering was entitled to claim those compounds. Take them out. There's no reason to do it. Why would those be an issue if you weren't asserting those compounds again? We weren't asserting them in the prior Glenmark case. They were arguing... There were lots of arguments that were based on those. There were broad genus claims that covered them. And what Schering did was to give up those claims. And the other thing you have to remember, Your Honor, is that when you get into the later stages of a patent like this... In the early stages, the patents are broad. They cover a lot of compounds. When you have a commercial product, as Schering did, at that point, what you care about are the claims that are narrow and that are directed to that specific product. No, that's not a ground for reissue. You cease to care about the compounds. It's not a ground for deleting them in a reissue. Oh, absolutely. But the error that was made here... And this was not challenged in connection with this case. But the error that was made here was in claiming compounds that were asserted to be inherently anticipated. It's a classic case of reissue. If you have a basis for reissue under the MPEP, all you need is one ground for doing it. And there could hardly be a dispute here that there was one legitimate ground for doing it, namely that there were claims in that patent that covered compounds that were asserted to be inherently anticipated by the prior art. Okay. Thank you. Thank you, Mr. Pritikin. Mr. Parker, you have a little over a minute here. Thank you, Your Honor. Actually, almost three. Okay. Okay. Thank you, Your Honor. Your Honor, with respect to Dr. Afonso's involvement, what the court recognized and what was noted was that sharing management asked Dr. Afonso to step in to synthesize 4E and 4F because Rosenblum failed, because the chemistry was difficult. That's the reason why Dr. Afonso got involved in the first place with respect to that compound. With respect to the method that Dr. Rosenblum used, which we refer to the Grignard process, five-step process, which is embodied in the 440 application on method F, the testimony by Dr. Rosenblum and others was that that was the most suited, which is why he looked to that first, and that process also failed. And then he abandoned the 440 and went to alternative methods using sphenium dioxide and a vinyl derivative in an attempt to make 4E and 4F. Those attempts also failed. I also wanted to make mention, too, that during trial, sharing had its own expert, Dr. Brisbois, try to emulate Dr. Rosenblum's five-step process. The district court discredited that attempt. He couldn't get it to work. So, again, it just goes to the elusive nature of the synthesis of 4E and 4F. They couldn't even get their own expert to even walk in the same footsteps as Dr. Rosenblum to make this compound. And with respect to the reissue, one of the things we wanted to... We know it's not brief, but trial counsel, during the penalty of the reissue, when asked, well, how are you going to defend against the Myland claim with respect to Dr. Afonso's adverse inventorship claim? And there, the trial counsel, at the time, explained that the claims of the reissue are going to take out the Afonso issue altogether. This is while the application was pending. He was already predicting that the claims will take out the inventorship issue altogether. So when they say they had a legitimate basis, perhaps they recited that with respect to metabolites. They removed non-metabolites, 60 and 60, which we never alleged were metabolites as far as inherent anticipation would go. And in fact, the preliminary amendment and the reissue declaration at least creates a clear impression that they were only taking out metabolites. Claim 7 is really the perfect example to look. There you have specific compounds that are claimed, including the ones that the attorneys set forth by name for A, for B, for E, and for F. Those were removed, but the remaining compounds in the claim were not metabolites. They were taken out, but azetamibe is left in, and azetamibe is not a metabolite. So obviously there was some discussion or some sort of decision as to what constituted, what didn't constitute, a metabolite. Your Honor, my time, I believe, just ran out. Thank you very much. Thank you, Mr. Parker. Thank both counsel in case it's permitted. And that concludes our session for today. Thank you. All rise. Your Honor, the court adjourns tomorrow morning at 5 a.m.